**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 220227-U

Order filed October 18, 2022

_

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* L.D., a Minor | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit |
| (The People of the State of Illinois, | ) | Kankakee County, Illinois |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-22-0227 |
| | ) | |
| v. | ) | Circuit No.  17-JA-15 |
| | ) | |
| Detric D., | ) | Honorable |
| | ) | JoAnn Imani Drew, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HETTEL delivered the judgment of the court.
Justices Daugherity and Peterson concurred in the judgment.

**ORDER**

¶ 1     *Held*:    Trial court's order finding father unfit for failing to make reasonable progress toward the return of his child during a nine-month period following adjudication was not against the manifest weight of the evidence where father was incarcerated for entire period and made no effort to contact L.D.'s caseworker or initiate visits with L.D.

¶ 2     Respondent Detric D. is the father of L.D. In March 2017, when L.D. was six months old, the State filed a petition alleging L.D. was neglected in that her environment was injurious to her welfare. Thereafter, the court adjudicated L.D. neglected and entered a dispositional order finding

respondent unfit. In June 2019, the State filed a motion to terminate respondent's parental rights, alleging respondent was unfit for failing to make reasonable progress toward the return of L.D. to his care during the nine-month period of July 1, 2018, to March 30, 2019. Following a hearing, the trial court entered an order finding respondent unfit and terminating his parental rights. Respondent appeals the trial court's finding of unfitness. We affirm.

¶ 3                                    BACKGROUND

¶ 4        L.D. was born on September 14, 2016, to respondent and Maria L. On March 28, 2017, the State filed a petition alleging L.D. was neglected in that her environment was injurious to her welfare. On the same day, a shelter care hearing was held. The trial court entered an order finding probable cause existed for the petition and that there was an immediate and urgent necessity to remove the minor from her home because of "illicit drug use in the home" and the parents' failure to "follow the safety plan laid out by DCFS" that prohibited Maria from being with the minor unsupervised. The court ordered L.D. to be placed in the temporary guardianship and custody of the Illinois Department of Children and Family Services (DCFS).

¶ 5        Respondent was ordered to complete an Integrated Assessment, which he did on April 24, 2017. Respondent was also ordered to do the following as part of his service plan: (1) complete a substance abuse assessment and follow all recommendations, (2) complete a mental health assessment and follow all recommendations, (3) regularly visit L.D., (4) attend AA/NA meetings, (5) participate in random urine or blood tests to ensure he remains drug free, (6) refrain from using alcohol/non-prescribed medication and illicit drugs, and (7) attend all court hearings.

¶ 6        An adjudicatory hearing was held on June 28, 2017. At that hearing, the trial court entered an adjudicatory order finding L.D. neglected in that her environment is injurious to her welfare because "[t]he sibling of this minor made statements about drug use in the home and the minor

was subjected to that drug use \*\*\* by the mother" and "[b]oth parents failed to cooperate with the department or comply with services."

¶ 7       On or about July 12, 2017, respondent was arrested on drug charges and taken into custody at Jerome Combs Detention Center in Kankakee. A dispositional hearing was held on August 23, 2017. Following the hearing, the court entered a dispositional order finding respondent unfit, made L.D. a ward of the court and granted custody of L.D. to DCFS with the right to place.

¶ 8       Respondent's updated service plan entered on September 7, 2017, required respondent to do the following, in addition to the tasks already required: (1) support his family financially; (2) attend all criminal court hearings and inform the caseworker of dates/times; (3) abide by court terms once he is released; (4) notify the caseworker of any incidents involving the police, court, DCFS, or law enforcement; and (5) stay out of legal trouble.

¶ 9       At permanency review hearings on October 25, 2017, and May 23, 2018, respondent was found to have (1) "**not** made reasonable and substantial progress toward returning the minor or home[,]" and (2) "**not** made reasonable efforts toward returning the minor home." (Emphasis in original.). On October 25, 2017, the trial court ordered respondent to cooperate with L.D.'s caseworker and complete the tasks required of him in his service plan. On May 23, 2018, the court ordered respondent to "contact the caseworker and/or DCFS in order to comply with the service plan."

¶ 10      In April 2018, defendant pled guilty to two drug charges and was sentenced to 14 years in prison. Immediately thereafter, respondent was transferred to Pittsfield Work Camp. In late 2018 or early 2019, defendant requested to no longer be brought back to court for hearings, explaining to the caseworker that he is in a work camp program seeking early release and every time he is brought back to court he has to start the program over.

¶ 11    Two separate permanency review hearings were held on April 3, 2019: one for the period of April 2018 to September 2018, and one for the period of October 2018 through March 2019. Respondent was not in court for those hearings. At the conclusion of each of those hearings, the court entered orders finding respondent had "**<u>not</u>** made reasonable and substantial progress toward returning the minor home" and had "**<u>not</u>** made reasonable efforts toward returning the minor home." (Emphasis in original.) The court ordered respondent to "comply with all services in the plan and with DCFS."

¶ 12    On June 5, 2019, the State filed a motion to terminate respondent's parental rights to L.D. The petition alleged that respondent is unfit and his parental rights should be terminated because he failed to make reasonable progress toward the return of L.D. to him during the nine-month period of July 1, 2018 to March 30, 2019.

¶ 13    On May 14, 2021, a hearing on the State's petition to terminate parental rights began. However, there is no report of proceedings or bystander's report contained in the appellate record for that date. The hearing was recommenced on May 21, 2021. On that date, the trial court confirmed that the State had rested its case. The only additional evidence provided by the State were certified copies of defendant's two drug convictions, showing defendant pled guilty to two drug charges on April 10, 2018.

¶ 14    On the second day of the termination hearing, respondent testified that he is residing in Shawnee Correctional Center. He expects to be released in two years. Respondent testified that L.D. is five years old. The last time he saw L.D. she was seven months old. Respondent testified that he was incarcerated during the entire period of July 1, 2018 to March 30, 2019. Respondent testified that services, such as drug programs and parenting classes, are available at Shawnee Correctional Center but were not offered for a period of time following COVID.

4

¶ 15    Respondent testified that he has had no visits with his daughter since his incarceration. He offered into evidence two "Offender Visitor Request" forms completed by him while he was at Pittsfield Work Camp. One was dated September 14, 2018, and listed L.D.'s caseworker as the "Expected Visitor[]." The second form was dated October 9, 2018, and listed both L.D. and her caseworker as "Expected Visitors." Both requests were approved. Respondent testified that the first visit, scheduled for September 28, 2018, never took place, and only L.D.'s caseworker came for the second visit, which was scheduled for October 26, 2018, but may have occurred on a later date. During that visit, the caseworker told respondent she did not bring L.D. because she "didn't think [L.D.] would behave for a car ride that long."

¶ 16    Respondent did not recall receiving any phone calls from L.D.'s caseworker from July 1, 2018, to March 30, 2019. He denied having any contact with L.D.'s caseworker prior to his completion of the visitation request forms in September and October of 2018. He testified that the caseworker "called the institution" and "[t]hey let me know that she called." As a result of that communication, respondent completed the visitor request forms.

¶ 17    Respondent testified he is currently on the waiting list for a drug education program at Shawnee Correctional Center. He said he made "multiple requests" to participate in that program. He provided no evidence regarding when he first made a request for the program but testified he made requests "[a]ll through that time frame" of July 1, 2018 to March 30, 2019. Later, respondent testified there were no services available to him from July 1, 2018, to March 30, 2019, because he was at the work camp during that time, and no programs or services were offered there. He testified that he would have availed himself to services if they were available. Respondent testified that he never called L.D. because he did not have a phone number for her. His ability to communicate with the outside world was not more difficult while he was Pittsfield Work Camp.

5

¶ 18       Respondent testified he only talked to L.D.'s caseworker once when she visited him. He testified he never talked to her by phone and denied having telephone conversations with her on September 28, 2018, December 21, 2018, or February 20, 2019. He also denied being told that L.D. and her caseworker were on their way to visit him when they were involved in a car accident.

¶ 19       On April 20, 2022, the trial court entered an order finding respondent unfit for failing to make reasonable progress toward the return of L.D. to him during the nine-month period of July 1, 2018, to March 30, 2019, "in that he failed to make a demonstrable movement towards the goal of reunification." The court stated:

> "Father was not in compliance with the service plan conditions including and significantly, substance abuse treatment and services and mental health treatment, and visitation. Father was incarcerated during the entire period[.] Mr. D** reported that he no longer wanted to be writ in for court, despite it would be an opportunity to see his daughter, because he was in a work program, and every time he had to come back for court he had to start the program over."

In that same order, the trial court terminated respondent's parental rights to L.D.

¶ 20                                    ANALYSIS

¶ 21       Respondent argues that the trial court erred in finding him unfit for failing to make reasonable progress toward the return of L.D. to him during the relevant nine-month period because services were not available to him then.

¶ 22        Before terminating parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (2020)), the trial court must find by clear and convincing evidence that the parent is unfit under the definitions provided in the Adoption Act (750 ILCS 50/1 (West 2020)). 705 ILCS 405/2-29(2) (West 2020). Section 1(D)(m)(ii) of the Adoption Act allows a finding of unfitness based on

6

a parent's failure to make reasonable progress toward the return of the child to the parent within any nine-month period following an adjudication of neglect, abuse, or dependency. 750 ILCS 50/1(D)(m)(ii) (West 2020). Section 1(D)(m) further provides:

> "If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication ***." 750 ILCS 50/1(D)(m) (West 2020).

¶ 23        "Reasonable progress is judged by an objective standard measured from the conditions existing at the time custody was taken from the parent." *In re A.S.*, 2014 (3d) 140060, ¶ 17 (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). "'Reasonable progress' requires, at a minimum, measurable or demonstrable movement toward the goal of return of the child, but whatever amount of progress exists must be determined with proper regard for the best interests of the child." *In re M.S.,* 210 Ill. App. 3d 1085, 1093-94 (1991) "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). Reasonable progress exists when the trial court determines it will be able to order the child returned to parental custody in the near future. *A.S.*, 2014 (3d) 140060, ¶ 17 (citing *Daphnie E.,* 368 Ill. App. 3d at 1067).

7

¶ 24 "[T]ime spent incarcerated is included in the nine-month period during which reasonable progress must be made." *In re J.L.*, 236 Ill. 2d 329, 343 (2010). Incarceration alone is not evidence of a parent's failure to make reasonable progress. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21; *In re M.A.*, 325 Ill. App. 3d 387, 392 (2001). Rather, the court must examine what the incarcerated parent did or did not do while in prison to determine if reasonable progress was made during the relevant period. See *In re S.P.*, 2019 IL App (3d) 180476, ¶ 53; *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 24; *In re Gwynne P.*, 346 Ill. App. 3d 584, 595-96 (2004); *In re M.A.*, 325 Ill. App. 3d at 392.

¶ 25 "A court's determination that clear and convincing evidence of a parent's unfitness has been shown will not be disturbed on review unless it is against the manifest weight of the evidence." *In re D.D.*, 196 Ill. 2d 405, 417 (2001). A decision is against the manifest weight of the evidence where the opposite conclusion is clearly proper. *Id.*

¶ 26 An incarcerated parent can demonstrate reasonable progress during a nine-month period by persistently requesting visits with his or her child. See *Gwynne P.*, 346 Ill. App. 3d at 595-96 (during relevant nine-month period, mother sent seven letters requesting visits with child). In contrast, an incarcerated parent fails to demonstrate reasonable progress when he makes no attempt to contact the caseworker or arrange visits with his child during the relevant nine-month period (*In re S.P.*, 2019 IL App (3d) 180476, ¶ 53) or makes no attempt to comply with the service plan (*In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 24).

¶ 27 The appellant bears the burden of presenting a sufficiently complete record of the proceedings in the trial court, and we will resolve against the appellant any doubts that arise from an incomplete record. In re *M.R.,* 393 Ill. App. 3d 609, 618 (2009). In the absence of a transcript

or a bystander's report, we can assume that the trial court heard sufficient evidence to support its decision. *Compton v. Country Mutual Insurance Co.,* 382 Ill. App. 3d 323, 333 (2008).

¶ 28   Here, the hearing to terminate respondent's parental rights was held on two days. However, the record contains a transcript from only the second day of the hearing. Apparently, on the first day of the hearing the State presented its evidence. Because there is no transcript or bystander's report of the first day of the hearing, we may presume that the trial court's unfitness finding was supported by the evidence. See *Compton,* 382 Ill. App. 3d at 333. However, we need not employ such a presumption in this case because even without the evidence the State presented on the first day of the hearing, there was sufficient evidence presented on the second day of the hearing to support the trial court's finding of unfitness.

¶ 29   Respondent's service plan required him, among other things, to complete substance abuse and mental health assessments, visit L.D., attend all court hearings, financially support his family, and communicate with L.D.'s caseworker. Less than two months before the relevant nine-month period, the trial court ordered respondent to "contact the caseworker and/or DCFS in order to comply with the service plan."

¶ 30   Respondent testified that some of the services required in the service plan, such as the substance abuse and mental health assessments, were not available to him during the relevant nine-month period because he was at a work camp where no such services were offered. Nevertheless, respondent testified that during the relevant nine-month period, he had access to and could communicate with the "outside world." This would include L.D.'s caseworker. However, respondent made no effort during the nine-month period to contact L.D.'s caseworker even though the service plan required him to communicate with her and the court ordered him to contact her. Respondent testified he only spoke to L.D.'s caseworker once during the relevant period when she

9

visited him at the work camp. Respondent initiated no contact with L.D.'s caseworker during the relevant nine-month period. Additionally, respondent made no attempt to initiate visitation with L.D. during the relevant period. While respondent completed an "Offender Visitor Request" listing L.D. as a potential visitor while he was at Pittsfield Work Camp, he completed that form only after being instructed to do to so by L.D.'s caseworker. Respondent made no attempt during the relevant nine-month period to contact L.D.'s caseworker or DCFS himself to request visitation with L.D.

¶ 31 While respondent's incarceration appears to have prevented him from complying with some of his obligations under the service plan, respondent made no attempt to fulfill any of his service plan obligations, even those within his power to accomplish, such as contacting L.D.'s caseworker and requesting visitation with L.D. Under these circumstances, the trial court's determination that respondent failed to make reasonable progress toward the return of L.D. during the relevant nine-month period was not against the manifest weight of the evidence. See *S.P.*, 2019 IL App (3d) 180476, ¶ 53; *Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 24.

¶ 32                                                    CONCLUSION

¶ 33 The judgment of the circuit court of Kankakee County is affirmed.

¶ 34 Affirmed.